# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 09CR2959WQH |
|---|---|
| Plaintiff, | ORDER |
| vs. | |
| GUADALUPE RAMOS, | |
| Defendant. | |

HAYES, Judge:

The matters before the Court are the following motions filed by the Defendant Guadalupe Ramos: 1) motion (#74-1) to dismiss Counts 8 and 9 as duplicitous; 2) motion (#74-2) to dismiss Counts 8 and 9 for failing to allege elements properly; 3) motion (#74-3) to dismiss Counts 8 and 9 for violation of the Sixth Amendment; 4) motion (#74-4) for bill of particulars; 5) motion (#74-5) to compel Government to elect between multiplicitous counts; 6) motion (#74-6) to suppress evidence for violations of the Fourth Amendment; 7) motion (#74-7) for evidentiary hearing on Fourth Amendment violations; 8) motion (#74-8) to dismiss Counts 8 and 9 for deportation of exculpatory witness; 9) motion (#74-9) to dismiss for *Brady* violations; 10) motion (#74-10) to dismiss for outrageous conduct; 11) renewed motion (#95-1, #95-2) to compel discovery; and 12) motions (#59 and #111-4) for leave to file further motions.

The indictment charges Defendant Guadalupe Ramos in Counts one through seven with transportation of illegal aliens in violation of 8 U.S.C. § 1324 and in Counts eight and nine

1  with assault upon a border patrol agent using a "dangerous and deadly weapon, in that
2  Defendant drove a vehicle towards" the border patrol agent. (Doc. # 20 at 4). The Court held
3  an evidentiary hearing on February 3, 2010, March 30, 2010, and April 15, 2010 in order to
4  receive all testimony and evidence offered to resolve the pending motions.

## FACTS

6  On July 20, 2009, at approximately 9 p.m., border patrol agents observed a white Honda
7  Accord and a Chevrolet truck being driven in tandem, in an area twenty-five miles east of the
8  Tecate Port of Entry and three miles north of the international border. The agents suspected
9  that the Honda and the truck were smuggling aliens. The Honda and the truck proceeded
10 westbound on Interstate 8. The agents followed. The Honda and the truck exited Interstate
11 8 at the Buckman Springs exit. The border patrol agents attempted to pull over the truck and
12 were successful after a short chase.

13 As a border patrol agent pulled in behind the Honda, the driver of the Honda pulled
14 back onto Interstate 8 heading eastbound. Border patrol agents followed the Honda heading
15 eastbound on Interstate 8 in the direction of the 708 checkpoint at a high rate of speed and
16 radioed to other agents for assistance.

17 At approximately seventeen miles east of the 708 checkpoint, Border Patrol Agent
18 Alexander Djokich was waiting in the median to assist in the pursuit. Agent Djokich saw the
19 Honda traveling eastbound on Interstate 8 at a high speed, "well over a hundred, maybe 120."
20 (March 30, 2010 Transcript at 163). Agent Djokich entered the freeway in a marked border
21 patrol vehicle in an attempt to stop the Honda. The driver of the Honda did not stop. Agent
22 Djokich continued to follow the Honda. The driver of the Honda was weaving in and out of
23 traffic and traveling at speeds nearly twice as fast as most of the vehicles on the interstate.
24 Pursuing agents radioed ahead to supervisors and to the checkpoint.

25 Approximately one mile before the 708 checkpoint, the interstate narrowed to one lane
26 by orange cones. The driver of the Honda continued to drive at excessive speeds and drove
27 over the cones used to direct traffic, eventually reaching the traffic waiting in line for
28 inspection at the checkpoint. The driver of the Honda drove on the shoulder of the road and

1   cut in front of a truck. Agent Djokich was stuck behind the truck and lost sight of the Honda
2   for a few moments. As the Honda approached the checkpoint, Agent Djokich saw the Honda
3   drive onto the shoulder, start passing vehicles on the left side of traffic, and cut back into
4   traffic. A short distance from the checkpoint, the driver of the Honda was forced to stop
5   hemmed in by traffic. Agent Djokich testified as follows:

> Q [Government counsel]: Did you see where the Honda went after it reached the checkpoint area?
> A [Djokich]: Yeah. After its initial, I would describe it as a pause, it – then it lurched forward, got back into the traffic and started traveling towards the checkpoint again, but just a short distance before the checkpoint. It again stopped and then, like, turned in the northbound – the nose of the vehicle was pointing towards the northbound lanes.
> Q: So in relation to your position and the Honda's position, when you said it turned northbound, would that mean that the Honda turned towards its left?
> A: Correct.
> Q: When it turned towards its left, what did it do?
> A: Stopped.
> Q: How long – did it start moving again?
> A: Yes. Shortly after it stopped.
> Q: Do you know how many seconds passed?
> A: Just a few seconds. I'm not sure exactly how long.
> Q: So when it started moving again, where did it go?
> A: It drove straight toward the checkpoint and the agents that were in front of it.
> Q: Did you see where the agents were at that time?
> A: Yes.
> Q: And where did the car go?
> A: The car lunged toward Agent – Border Patrol Agent Wilson.

18  *Id.* at 172-173.

19      Border Patrol Agent Joshua Wilson was on duty at the primary inspection area at the
20  eastbound 708 checkpoint. Agent Wilson had been informed by way of his service radio to
21  be on the look-out for the white Honda. Agent Wilson, the senior agent on duty at the
22  checkpoint, started assigning other positions to other agents to deploy spike strips. Agent
23  Wilson testified that it was happening very fast and that they were preparing for the arrival of
24  the Honda.

25      Agent Wilson was near the blocking vehicle at the primary inspection point when he
26  first saw the Honda traveling eastbound pulling around traffic and knocking down cones.
27  Agent Wilson initially observed the Honda as "[i]t pulled out from the pack of traffic that was
28  in front if it, drove over quite a few cones, drove out past the pack of traffic, and then turned

1 abruptly to the driver's left, facing northbound in the eastbound lanes." *Id.* at 213. Agent
2 Wilson testified that he "anticipated a bailout" when the Honda came to a stop facing
3 northbound and he "took off running towards the vehicle." *Id.* at 215. Agent Wilson explained
4 that "it's oftentimes common practice for alien smuggling vehicles to stop when they're being
5 chased and have every – everybody exit the vehicle and just scatter." *Id.*

6      As Agent Wilson was running toward the Honda which was stopped and facing
7 northbound, the driver redirected the Honda eastbound and began moving again in the
8 direction of Agent Wilson. Agent Wilson testified:

9      Q [Government counsel]: And between the time that you ran from the primary checkpoint area and the time that you saw the car move toward you, had you
10      taken out your firearm yet?
     A [Agent Wilson]: I don't believe so, sir.
11      Q: And when the car started driving eastbound again, about how many yards away from you was that car?
12      A: 75 or so, sir.
     Q: When the car started driving eastbound, what did you hear?
13      A: I heard the engine and –all I remember is the engine, actually.
     Q: And what part of the car did you see when it started traveling eastbound?
14      A: Once it started traveling eastbound, all I could see was its headlights.
     Q: And it was a full frontal profile to your position?
15      A: Yes, sir.
     Q: And what did you do?
16      A: At some point, I drew my weapon and began to fire on the vehicle.
     Q: And where did you aim your weapon?
17      A: At the driver.

18 *Id.* at 216-217. At this point in time, Agent Wilson was in the middle of the interstate, off-
19 lining to his right toward the median, and without any viable cover. Agent Wilson continued
20 to fire his weapon at the Honda as it passed close to his location to his left side striking the
21 Honda a number of times in the driver's side. The driver drove the Honda down a twenty foot
22 embankment in the median of the interstate. The driver of the Honda and several passengers
23 immediately exited the vehicle and ran northbound up the embankment.

24      Agent Wilson ran in the direction of the driver later identified as the Defendant. As the
25 driver ran up the other side of the median, Agent Wilson decided to head back to get his
26 canine. On the way to get his canine, Agent Wilson came across a group of agents attempting
27 to take an individual who had run from the Honda into custody. The individual was not
28 cooperative refusing to provide agents with his arms so that he could be handcuffed. Agent

1  Wilson drew his taser and issued a warning. The individual later identified as Juan Carlos
2  Echeverria continued to be uncooperative and Agent Wilson deployed the taser dots into
3  Echeverria's torso. The agents attempted to take Echeverria into custody and he remained non-
4  compliant. Agent Wilson detached the taser from the taser unit and initiated a stun drive.
5  Echeverria was taken into custody and subsequently transported to the hospital.

6  At the initial report of the Honda heading toward the checkpoint, Border Patrol Agent
7  Larry Roberts was stationed in the brake check area near primary inspection to deploy a spike
8  strip. Agent Roberts heard screeching tires near the primary inspection area, dropped the spike
9  strips, and came running toward the blocking vehicle at the primary inspection point. Agent
10 Roberts ran past the blocking vehicle and saw the white Honda stopped in the eastbound lanes.
11 Agent Roberts testified: "When I first saw it, it stopped and appeared as if it tried to reverse
12 and go back westbound in the eastbound lanes." *Id.* at 294. Agent Roberts suspected that the
13 occupants of the vehicle were going to bail out of the vehicle and take off on foot. Agent
14 Roberts saw Agent Wilson in his peripheral vision on his right side approximately 15 or 20
15 yards from his position when he was running toward the Honda. Agent Robert stated:

> A [Agent Roberts]: Like I said before, it appeared as if [the Honda] tried to go back the westbound and the eastbound lanes. When its avenue of exit was cut off, the vehicle engine revved and started going eastbound toward my position and also Agent Wilson's position.
> Q [Government counsel]: Where were you? Were you behind Agent Wilson at the time that you were observing the white Honda?
> A: Yes, sir. I would say I was behind, off to his left.
> Q: At the time you heard the engine rev, what did the Honda do?
> A: It took off and came towards our direction.
> Q: ... Now at this time, did you notice what Agent Wilson did?
> A: Basically he had his hands up, um, of course, you know, yelling "Stop." But at that point in time, the only thing I can remember is him actually pointing his weapon.
> Q: At this time, were you concerned for your own safety?
> A: Yes, sir, I was.
> Q: And at some point, did you draw your weapon?
> A: Yes, sir, I did.
> Q: Now did you draw your weapon before or after the Honda started moving from that stopped position?
> A: Drew my weapon after.
> Q: And did you discharge your weapon at that car?
> A: Yes, sir, I did. ...
> Q: When the Honda approached your location, to what side did it pass Agent Wilson?
> A: Left side.
> Q: It passed Agent Wilson's left side?

1       A: That's correct.
      Q: So the Honda drove between your and Agent Wilson's location?
2       A: That's correct.

3 *Id.* at 297-298.

4       On cross-examination by defense counsel, Agent Roberts stated:

5       Q [defense counsel]: From the time the Accord reversed, stopped, and then headed back east towards the checkpoint, past Agent Wilson and past you, was it heading in, essentially, a straight line?
6 
      A [Agent Roberts]: At first, it appeared that the vehicle was traveling directly
7       – when it first took off, directly towards Agent Wilson. And then as Agent Wilson, stopped – you know, stopped and everything else, the vehicle kept
8       going. Pulled his weapon, and the vehicle started to veer back towards my direction, kind of out over the road, and then went betwe– you know, after the
9       shot are being fired went between the two of us and off the road....
      Q: ... As the Accord passed Wilson on his left-hand side, how far was Wilson
10       from the Accord as it passed him?
      A: I would say 5 yards or less.
11       Q: 5 yards or less. When the car passed you on your right-hand side, how far was the car from you, sir?
12       A: Probably 5 to 7 yards, a little bit more.

13 *Id.* at 307, 310.

14       Agent Roberts saw the Honda go off the embankment and come to a stop. Agent Roberts holstered his weapon and chased after the driver and passengers fleeing from the Honda. Border patrol agents approached the Honda and found three people still in the passenger compartment of the vehicle and four people in the trunk. The driver and the other fleeing passengers were apprehended. Defendant in this case was the driver of the Honda. Echeverria, who also fled from the Honda, was seated in the back seat of the Honda behind the Defendant driver.

      Each person apprehended at the scene admitted to being a citizen of Mexico illegally present in the United States.

      Border Patrol Agent Salvador Vasquez was assigned to the "Critical Incident Team" which responded to the report of an assault and an officer involved shooting on the night of the incident. Agent Vasquez interviewed the all of the agents and material witnesses involved in the incident.

      On July 23, 2009, Agent Vasquez interviewed Echeverria after his release from the hospital at the Chula Vista Border Patrol Station regarding the alleged assault on the agents.

1  Echeverria explained to Agent Vasquez that it was dark, that he was told to get into the Honda,
2  and that he sat behind the driver.  Echeverria stated that there was a pickup truck in front of
3  them and that they encountered the border patrol.  Echeverria stated that the driver of the
4  Honda took off and got back on the freeway and continued to drive while border patrol agents
5  pursued. Echeverria made the following statements to the Agent Vasquez describing the
6  encounter at the checkpoint:

> Vasquez: Okay.  And, when you were in the car, and, and they were on the way, and they were already, ... you say you saw the officers there, right?
> Echeverria: Uh-huh.
> Vasquez: Uh, the driver, what did he do ... what did he do, uh, before they shot, uh at you with guns?
> Echeverria: When they shot with the guns?
> Vasquez: Yes.  Did he say something, or –, do you remember if–?
> Echeverria: I don't remember him saying anyth–, I don't remember him saying anything.  No, no, since he was like that toward the front, I didn't –, I couldn't hear very well what he, what he was talking about, or what he was saying.  No, I didn't hear him, I didn't hear him, hear him.  I just saw that he wanted to try to swerve to one side and what happened was the car went ... into the dirt."
> Vasquez: Okay, Did you see officers in front of the car?
> Echeverria: I saw officers like that, when it was ... the car was like that the officer had his gun toward the front. And he wanted to —.
> Vasquez: What, what did you think?  Did you think that the driver was going to go toward where the officers were or that they were going to–?
> Echeverria: No, I just thought that we're in trouble if the – officer was there, how was he going to swerve with the car over there?
> Vasquez: When you say he hurled the car at him, he –, he turned around toward where–?
> Echeverria: He moved to one side.
> Vasquez: Toward where the officer was?
> Echeverria: No. Like, since he saw the officer was there and like he went like this toward the shoulder, to swerve toward the shoulder.
> Vasquez: And did you see that officer was there at the shoulder or, or was there not one there?
> Echeverria: Then, then –, and, then I didn't see because afterwards they started shooting.

(Defendant Exhibit R at 5-6).

Agent Vasquez testified that at the conclusion of his interview with Echeverria he did not think that any statement made by Echeverria was exculpatory to the allegations of assault against Defendant Ramos.  Agent Vasquez testified "I felt that everything Mr. Echeverria stated to me was accurate as what I was observing and I had been told in the field by agents and everybody else."  (February 3, 2010 Transcript at 47).  Agent Vasquez testified:

> Q [Government counsel]: When you interviewed Mr. Echeverria, why did you think what he said was consistent with what your previous investigation was?

> A [Agent Vasquez]: A couple of reasons. He never made any – any kind of indication that – that there was anything wrong. And on the other side of that coin, he was very apologetic to having ran or offended any of the officers.
> Q: Okay. And what portion of that led you to believe that his statements was consistent with your investigation?
> A: Echeverria stated that he thought it was - it was wrong, it was a bad decision on the part of the driver that the driver drove toward the agents....
> Q: And the translation on page 21 says that Echeverria said, 'No, I just thought they were in trouble. If the officer was there, how was he going to swerve the car over there.' ... how did you take that statement?
> A: Like I said, it was – it– I took that statement like meaning if there is an agent there, you know, why would this driver intentionally drive over there, accepting that there was an agent there, and he did drive there. So Echeverria, Mr. Echeverria was kind of dumb-founded in that why, indeed, the driver drove toward the agent.
> Q: So after you completed the interview of Echeverria, were you aware that there were some allegations or the possibility that he may be making allegations of abuse by border patrol agents?
> A: Yes.
> Q: And based upon that information, what did you do after you completed this interview?
> A: Arrangements were made for him to go to Barracks 5, a hold for our team to interview him. We interviewed him. Upon my completion of the interview, I returned Mr. Echeverria back to the holding facility Barracks 5. I informed the accepting officer that the CIT team was done as far as the interview goes for the Critical Incident Team and that Ed Parra from the professional standards division is still going to be speaking with him.
> Q: Then after your interview, you were going to leave it to Mr. Parra as to whether or not to decide to retain Mr. Echeverria in connection with this case?
> A: The decision does not fall within the Critical Incident Team.

*Id.* at 47-49.

After the interview, Vasquez contacted Border Patrol Agent Edward Parra, a supervisory border patrol agent assigned to the professional standards division. Agent Parra's duties included investigation of allegations of abuse against border patrol agents. Agent Vasquez informed Agent Parra that all interviews were completed with Echeverria. Agent Parra decided to interview Echeverria because he had been advised that Echeverria had made statements to the nursing staff when hospitalized that he had been assaulted during his apprehension. Agent Parra contacted Echeverria in Barracks five in San Ysidro to determine whether he was filing a formal complaint against border patrol agents. Agent Parra asked Echeverria whether he had a complaint regarding his treatment at the time of his arrest or afterwards. Echeverria "was adamant that he didn't want to complain, that all he wanted was to return to Mexico." *Id*. at 120. Agent Parra determined that he had no reason to retain Echeverria in connection with the allegations of abuse.

Echeverria was held in custody pending deportation proceedings and deported by immigration officials.

## ANALYSIS

1) <u>Motion to Dismiss Counts 8 and 9 as duplicitous (#74-1)</u>

Defendant moves the Court to dismiss Counts 8 and 9 on the grounds that they are duplicitous. Defendant contends that Counts 8 and 9 charge "ten separate crimes" in that each charges the "separate offenses of assaulting, resisting, opposing, impeding, and interfering." (Doc. # 74-1 at 5). The Government asserts that each count properly charges "one offense with five means and manner of violating that charge." (Doc.# 87 at 5).

The indictment charges the Defendant as follows:

<u>Count 8</u>

On or about July 20, 2009, within the Southern District of California, defendant GUADALUPE RAMOS did willfully and forcibly assault, resist, oppose, impede, and interfere with a person named in Title 18, United States Code, Section 1117, to wit, Department of Homeland Security, Border Patrol Agent J. Wilson, while Agent Wilson was engaged in the performance of his official duties, and in committing such offense, did use a dangerous and deadly weapon, in that defendant drove a vehicle towards Agent Wilson, causing Agent Wilson to fear for his life; in violation of Title 18, United States Code, Sections 111(a)(1) and (b), a felony.

<u>Count 9</u>

On or about July 20, 2009, within the Southern District of California, defendant GUADALUPE RAMOS did willfully and forcibly assault, resist, oppose, impede, and interfere with a person named in Title 18, United States Code, Section 1117, to wit, Department of Homeland Security, Border Patrol Agent L. Roberts, while Agent Roberts was engaged in the performance of his official duties, and in committing such offense, did use a dangerous and deadly weapon, in that defendant drove a vehicle towards Agent Roberts, causing Agent Roberts to fear for his life; in violation of Title 18, United States Code, Sections 111(a)(1) and (b), a felony.

(Doc. # 20 at 4).

In reviewing an indictment for duplicity, the court "look[s] to the indictment itself to determine whether it may fairly be read to charge but one crime in each count." *United States v. Morse*, 785 F.2d 771, 774 (9th Cir. 1986). The "task is not to review the evidence presented at trial to determine whether it would support charging several crimes rather than one, but rather solely to assess whether the indictment itself can be read to charge only one violation

1  in each count." *United States v. Martin*, 4 F.3d 757, 759 (9th Cir. 1993)(citation omitted).

2  Subsection 111(a)(1) provides, in relevant part, that anyone who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any [designated federal officer] while engaged in or on account of the performance of official duties," shall be imprisoned. Subsection 111 (b) increases the penalty for anyone who "uses a deadly weapon or dangerous weapon." The indictment in this case tracks the language of Section 111(a) using the conjunctive rather than the disjunctive. When the statute speaks in the disjunctive, the government may prove in the disjunctive, even if the indictment charges in the conjunctive. *See United States v. Arias,* 253 F.3d 453, 457-58 (9th Cir. 2001). The Court concludes that the indictment may fairly be read to charge only one violation of 18 U.S.C. § 111 in each count. The motion to dismiss Counts 8 and 9 as duplicitous (#74-1) is denied.

2) <u>Motion to Dismiss Counts 8 and 9 for failing to allege elements properly</u> (#74-2)

Defendant contends that Counts 8 and 9 of the indictment must be dismissed on the grounds that the allegations fail to properly charge the element of *mens rea.* Defendant asserts that the indictment fails to allege that the vehicle was used willfully; and that the vehicle was capable of causing serious bodily injury and the Defendant used it in that manner. Defendant contends that these additional allegations are necessary in this case because he should not be convicted under this statute if he was "merely trying to effectuate an escape." (Doc. # 74-2 at 8).

The Government contends that the language in Counts 8 and 9 of the indictment adequately charges that defendant willfully and forcibly assaulted the agents using a dangerous weapon by driving a vehicle toward the agents causing the agents to fear for their lives. The Government asserts that cars have been recognized as deadly weapons in this circuit and that the language in the indictment is clear and unambiguous.

An indictment is a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1). A legally sufficient indictment must state the elements of the offense charged with sufficient clarity to apprise a defendant of the charge against which he must defend and to enable him to plead double jeopardy. *See United*

*States v. Givens*, 767 F.2d 574, 584 (9th Cir. 1985). An indictment which tracks the words of the statute charging the offense is sufficient so long as the words unambiguously set forth all elements necessary to constitute the offense. *See Hamling v. United States*, 418 U.S. 87, 117 (1974). "The test of sufficiency of the indictment is not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *United States v. Awad*, 551 F.3d 930, 935 (9th Cir. 2009) (quotation and citation omitted).

In *United States v. Feola*, 420 U.S. 671 (1975), the United States Supreme Court stated that Section 111 "requires ... an intent to assault." *Id.* at 684. "[I]n order to incur liability under §111 an actor must entertain merely the criminal intent to do the acts therein specified." *Id.* at 686. The indictment in this case charges under Section 111(a) and (b) that the Defendant "did willfully and forcibly assault, resist, oppose, impede and interfere" with the border patrol agent engaged in the performance of his official duties using "a dangerous and deadly weapon in that defendant drove a vehicle towards [the agent] causing [the agent] to fear for his life." (Doc. # 20 at 4). The indictment adequately alleges the *mens rea* element of the offense in Counts 8 and 9. The jury will be required to find that the Defendant committed a "willful and forcible" act "us[ing] a dangerous and deadly weapon."[1] The Court concludes that the indictment provides sufficient clarity to apprise a defendant of the charge against which he must defend and to enable him to plead double jeopardy. *See Givens*, 767 F.2d at 584. The motion to dismiss Counts 8 and 9 for failing to allege elements properly (#74-2) is denied.

3) <u>Motion to Dismiss Counts 8 and 9 for violation of the Sixth Amendment (#74-3)</u>

Defendant asserts that the federal assault statute 18 U.S.C. § 111 is unconstitutional after *Apprendi v. New Jersey*, 530 U.S. 466 (2000) because the deadly weapon and bodily injury sections fixing the maximum sentence are sentencing enhancements. The Government asserts that *Apprendi* does not render the statute unconstitutional because the issues of deadly weapon and bodily injury are submitted to the jury in a special verdict.

---

[1] The 9th Circuit model jury instructions require the jury to find that the "defendant intentionally used force in [assaulting] [resisting] [intimidating] [interfering with] the officer" and that "the defendant used a deadly or dangerous weapon." 9th Cir. Jury Instruction 8.2. The instruction states: "There is a use of force when one person intentionally [strikes] [wounds] another, or when one person intentionally makes a display of force which reasonably causes a person to fear immediate bodily harm."

The Court finds that 18 U.S.C. § 111 is not facially unconstitutional. The deadly weapon section of the statute has been "charged in the indictment, [will be] submitted to the jury, subject to the rules of evidence, and proved beyond a reasonable doubt." *United States v. Buckland,* 289 F.3d 558, 568 (9th Cir. 2002). The motion to dismiss Counts 8 and 9 for violation of the Sixth Amendment (#74-3) is denied.

4) <u>Motion for Bill of Particulars</u>  (#74-4)

Fed. R. Crim. P. 7(f) authorizes the court to "direct the filing of a bill of particulars." The test for granting a bill of particulars is whether the indictment is so vague that a bill of particulars is required. *United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979). Full discovery obviates the need for a bill of particulars. *Id.* In this case, the Court concludes that there are no facts or circumstances which would require a bill of particulars.  The motion for bill of particulars  (#74-4) is denied.

5) <u>Motion to compel Government to elect between multiplicitous counts</u> (#74-5)

Defendant contends that the Court should require the Government to elect between Count 8 and Count 9. Defendant asserts that Count 8 and Count 9 allege a single act of assault against two government agents which must be charged in one count. The Government asserts the motion should be denied "because each agent was a victim of defendant's assault." (Doc. # 87 at 9).

In *Ladner v. United States*, 358 U.S. 169, 178 (1958), the United States Supreme Court concluded that "the single discharge of a shot gun" which wounded two officers constituted a single act of assault and a single violation under the assault statute. In this case, the Court held a full evidentiary hearing. Based upon the evidence presented, the Court finds that the trier of fact could conclude from all of the evidence presented that the Defendant committed two separate acts of assault. There was evidence at the hearing that the agents in this case were positioned on different sides of the vehicle, that the Defendant drove the vehicle in one direction toward one agent, and that the Defendant changed direction driving the vehicle toward the other agent. Under the facts of this case, the trier of fact could conclude that the Defendant committed two acts of assault, or in the alternative, that the Defendant committed only one of the two acts of assault alleged. The Court concludes that the Government is not

1  required to elect between Count 8 and Count 9.  The motion to compel Government to elect
2  between multiplicitous counts (#74-5) is denied.

3  6) <u>Motion to Suppress evidence for violations of the Fourth Amendment</u> (#74-6)
4  7) <u>Motion for evidentiary hearing on Fourth Amendment violations</u> (#74-7)
5  10) <u>Motion to dismiss for outrageous conduct</u> (#74-10)

6       Defendant moves the Court to suppress all statements and physical evidence that flowed
7  from the stop and/or illegal seizure in this case.  Defendant contends that the manner of
8  seizure, particularly the firing of deadly weapons instead of using spike strips violated his
9  rights under the Fourth Amendment and requires the suppression of evidence.  Defendant
10 concedes that the use of deadly force might be justified by the "theory" in the indictment that
11 the Defendant drove a vehicle towards the agents at a high rate of speed, but asserts that 1) the
12 "theory is contradicted by physical evidence," 2) the "theory is contradicted by the post-arrest
13 statements of the deported material witness" Echeverria, 3) the "theory is contradicted by
14 statements made by agents prior to the shooting," and 4) the "theory is contradicted by law."
15 (Doc. # 74-1 at 13-14).

16      The Government contends that the Defendant continuously failed to stop while being
17 pursued on the interstate, and at the checkpoint.  The Government asserts that the agents only
18 used deadly force when the Defendant drove his vehicle directly at them and the agents were
19 in fear for their safety.  The Government contends that the agents used only necessary and
20 reasonable force to protect themselves from the actions of the Defendant.

21      When a vehicle is stopped by law enforcement, all of its occupants are "seized" for
22 Fourth Amendment purposes.  *Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 2406-
23 2407 (2007).  In determining whether such a seizure comports with the Fourth Amendment
24 "[t]he touchstone ... is reasonableness." *United States v. Kriesel*, 508 F.3d 941, 941 (9th Cir.
25 2007) (quoting *Samson v. California*, 547 U.S. 843, 855 n. 4 (2006)).  The "general Fourth
26 Amendment approach" requires courts to examine the totality of the circumstances to
27 determine whether a search or seizure is reasonable. *United States v. Knights*, 534 U.S. 112,
28 118 (2001)(citation omitted).  "The first aspect of reasonableness concerns the level of
   suspicion that the government agents must possess to justify their intrusions." *United States*

1  *v. Guzman-Padilla,* 573 F.3d 865, 876 (9th Cir. 2009).

> The second aspect of the inquiry concerns the manner in which a seizure is conducted-typically whether law enforcement used excessive force. All claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard. In doing so, courts consider the totality of the circumstances, and balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.

*Id.* (citations and quotations omitted).

In this case, Defendant concedes that the agents acted with a level of suspicion required to justify the stop and that force used "might" be justified if Defendant "drove a vehicle towards the agents at a high rate of speed." (Doc. # 74-1 at 13). Defendant asserts that the agents used excessive force in this case because their belief that he was driving his vehicle toward them was not reasonable under the circumstances of this case.

The Court must determine whether the agents reasonably believed that the force used was necessary in order to protect themselves based upon the totality of the circumstances. "To assess the reasonableness of th[e] conduct, [a court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion paying careful attention to the facts and circumstances of each particular case." *Guzman-Padilla,* 573 F.3d at 886 (citations and quotations omitted). After the full presentation of evidence, the Court concludes that the interest of the government agents in protecting their safety was very strong in this case based upon the imminent and serious danger posed by the actions of the Defendant. The agents lawfully attempted to stop the vehicle based upon reasonable suspicion that the Defendant was engaged in criminal activity. Defendant refused to stop his vehicle and began a high speed encounter with border patrol. Defendant used dangerous means to attempt to avoid apprehension over a lengthy period of time. Defendant traveled over twenty miles in the dark on Interstate 8 at over one hundred miles per hour, weaving in and out of traffic posing a serious danger to the public.

When the Defendant approached the checkpoint, he continued to drive the Honda recklessly and continued to pose a serious danger to the public, and the border patrol officers.

Defendant had many opportunities to stop the Honda and to put an end to the incident. At the checkpoint, the Defendant reached an area where traffic cones, other public vehicles, and border patrol officers blocked his way yet continued to act in a very dangerous manner. Defendant was initially stopped by the traffic and cones but drove on the shoulder of the road and weaving in and out of traffic. Defendant was stopped a second time a short distance from the blocking vehicle at the checkpoint and maneuvered his vehicle in a manner indicating to the agents that he would attempt to drive back west on the eastbound highway. Agent Wilson and Agent Roberts were aware that the Defendant was acting in a reckless and dangerous manner and posed an extreme danger to the public traveling on Interstate 8.

Agent Wilson and Agent Roberts reasonably concluded that the driver and the passengers of the vehicle were about to bail out and flee the vehicle. Agent Wilson and Agent Roberts both testified that they ran toward the stopped Honda anticipating a bail out with their guns in their holsters. Defendant then maneuvered the Honda back in the direction of the approaching agents. Defendant started to drive the Honda directly toward Agent Wilson and Agent Roberts in the dark on the interstate posing an extreme danger to the agents. The agents reasonably believed that the Defendant was driving the Honda at them, drew their weapons, and began to fire at the driver of the Honda in an attempt to protect themselves.[2] With Officer Wilson off-lining to the right of the Honda and Agent Roberts off-lining to the left of the Honda, the Defendant drove the Honda in a dangerous manner toward Agent Wilson then changed direction and drove toward Agent Roberts passing between the agents within several yards of each agent. Defendant had many opportunities to advance his interest in personal safety and to avoid use of deadly force in this case.

"[T]he touchstone of the Fourth Amendment is reasonableness." *Samson*, 547 U.S.at 544 n.4. The agents in this case acted reasonably in the face of actions of the Defendant that were entirely unreasonable. The nature and quality of the intrusion on the Defendant's Fourth Amendment interests is far outweighed by the danger the Defendant posed to the officers. The

---

[2] Defendant has not identified any basis for his claim that the actions of the officers were not consistent with border patrol policies. *See Guzman-Padilla*, 573 F.3d at 890. ("[T]he government's violation of its own rules does not provide a basis for the suppression of evidence in a criminal action.")

motion to suppress evidence for violations of the Fourth Amendment (#74-6) is denied; the motion for evidentiary hearing on Fourth Amendment violations (#74-7) was granted; and the motion to dismiss for outrageous conduct (#74-10) is denied.

8) <u>Motion to dismiss for Brady violations</u> (#74-9)

Defendant contends that the indictment in this case should be dismissed on the grounds that government agents administratively removed to Mexico the material witness Juan Carlos Echeverria knowing that he possessed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Defendant asserts that Agent Vasquez interviewed Echeverria; that Echeverria stated that Defendant was not driving towards the agents but was instead trying to go around the agents; and that Echeverria's testimony would have been exculpatory. The Government contends that the personal opinion of Echeverria regarding the intent of the Defendant in driving the car is not admissible or exculpatory.

In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In *Dring*, the Court of Appeals explained that bad faith of government agents and prejudice to Defendant's case are irrelevant in cases where "the Government failed to disclose *evidence which it knew to be exculpatory*." 930 F.2d at 694 n.7. Bad faith is not required because the nature of the evidence is such that the "omission [of the evidence] is of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Agurs*, 427 U.S. 97, 108 (1976). This inquiry is not made in consideration of the "misdeeds" of the government agents but upon "avoidance of an unfair trial to the accused." *Brady,* 373 U.S. at 87; *see also Arizona v. Youngblood*, 488 U.S. 51, 57 (1988) ("[T]he good or bad faith of the State [is] irrelevant when the State fails to disclose material exculpatory evidence."); *Agurs*, 427 U.S. at 110 ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Agurs*, 427 U.S. at 109-110. The United States

Supreme Court explained:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Id.* at 113. In *Valenzuela-Bernal*, the Supreme Court stated: "Because determinations of materiality are often best made in light of all of the evidence adduced at trial, judges may wish to defer ruling on motions until after the presentation of evidence." 458 U.S. at 874.

The Court must determine whether the agents for the Government in this case deported Echeverria knowing that he possessed exculpatory evidence "in the context of the entire record." *Agurs*, 427 U.S. at 113. Prior to the interview with Echeverria, Border Patrol Agent Vasquez conducted an investigation into the alleged assault and the officer involved shooting. Agent Vasquez interviewed the all of the agents and material witnesses involved in the incident. Agent Vasquez then interviewed Echeverria at the Chula Vista Border Patrol Station regarding the alleged assault on the agents. Echeverria explained to Agent Vasquez that it was dark, that he was told to get into the Honda, and that he sat behind the driver. Echeverria explained that there was a pickup truck in front of them and that they encountered the border patrol. Echeverria stated that the driver of the Honda "took off and got back on the freeway" and continued to drive despite the pursuit of border patrol agents. Echeverria was a passenger in the back seat behind the driver. (Defendant Exhibit R at 3). Echeverria told Agent Vasquez that he did not hear the driver say anything, that he saw the officers at the front of the car, and that the shooting started. Statements made by Echeverria to Agent Vasquez regarding what Echeverria thought the driver was trying to do did not contradict the facts as stated by any witness to the incident and would not be admissible to negate the intent of the Defendant. Considering the record as a whole, the Court concludes that the statements made by Echeverria were not materially exculpatory of the charges that Defendant Ramos assaulted border patrol agents using a "dangerous and deadly weapon, in that defendant drove a vehicle towards" the

1  border patrol agents.  (Doc. # 20 at 4).  The jury in this case will have to determine whether
2  the Defendant acted with the *mens rea* required  under 18 U.S.C. § 111.  The Court concludes
3  that Echeverria made no statements to assist the jury in this fact finding or to assist the
4  Defendant in defending against the charges.

5  After full presentation of evidence and based upon the complete hearing record, the
6  Court finds that the statement of Echeverria was not "of sufficient significance to result in the
7  denial of the defendant's right to trial." *Agurs*, 427 U.S. at 108.  In the context of the record
8  as a whole, the Court concludes that the statement by Echeverria does not "establish
9  'materiality' in the constitutional sense." *Id.* at 110.  The motion to dismiss for *Brady*
10 violations (#74-9) is denied without prejudice to refile after presentation of evidence at trial.
11 9) Motion to Dismiss Counts 8 and 9 for deportation of exculpatory witness (#74-8)

12 Defendant moves the Court to dismiss the indictment on the grounds that the
13 Government violated his right to due process under the Fifth Amendment and his right to
14 compulsory process under the Sixth Amendment when it administratively removed Echeverria
15 to Mexico.  Defendant contends that the Agent Vasquez acted in bad faith departing from
16 normal deportation procedures by not retaining a witness that he knew had information
17 material and favorable to the Defendant.

18 The Government contends that Agent Vasquez reasonably believed that Echeverria's
19 statement was not exculpatory and that Echeverria was deported through the customary
20 process.  The Government contends that the Defendant has not made an affirmative showing
21 of bad faith on the part of the Government and that Defendant cannot make a showing of
22 prejudice.

23 The right to retain a deportable alien witness is based upon the Fifth Amendment
24 guarantee of due process of law and the Sixth Amendment guarantee of compulsory process
25 for obtaining witnesses in one's favor.  *See United States v. Medina-Villa*, 567 F.3d 507, 516
26 (9th Cir. 2009).  In *United States v. Dring*, 930 F.2d 687, 693 (9th Cir. 1991), the Court of
27 Appeals explained:

28
> In cases of constitutionally guaranteed access to evidence, wherein the Government loses potentially exculpatory evidence, the Supreme Court applies a two-pronged test of bad faith and prejudice.... Under this two-pronged test, the

> defendant must make an initial showing that the Government acted in bad faith *and* that this conduct resulted in prejudice to the defendant's case. To prevail under the prejudice prong, the defendant must at least make 'a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses.'

*Id.* quoting *United States v. Valenzuela Bernal*, 458 U.S. 858, 873 (1982). "To establish that the government acted in bad faith, [the defendant] must show either that the Government departed from normal deportation procedures or that the Government deported [the witness] to gain an unfair tactical advantage over him at trial." *Medina-Villa*, 567 F.3d at 517-518 (quotation and citation omitted).

The Court finds the testimony of Agent Vasquez that he believed that he had no reason to retain Echeverria in connection with the allegations of assault against Defendant Ramos to be credible. The evidence in this case establishes that Agent Vasquez was assigned on the night of the incident to investigate the alleged assault as the head of the Critical Incident Team, and that Agent Vasquez interviewed all the of the witnesses to the incident. All of the witnesses to the incident told Agent Vasquez that one of the agents was positioned on the right side of the Honda and one of the agents was positioned on the left side of the Honda, and that the Defendant drove the Honda towards the agents passing between the two agents. Echeverria was the last witness interviewed because he had been hospitalized after the incident. Echeverria's account of the events leading up to the shooting was consistent with the statements of Agent Roberts, Agent Wilson, and all other accounts of the actions of Defendant on the night of the incident. Echeverria's account of the events did not provide any material facts to the contrary. Echeverria stated that the driver made no statements prior to turning the Honda toward the agents.

Agent Vasquez had no motive to deport Echeverria based upon the allegations that Echeverria had been beaten and would make a complaint. Agent Parra was charged with investigating the complaints of abuse. Agent Vasquez was investigating the assault and the discharge of firearms of the agents, had no role in investigating the allegations of abuse, and contacted Agent Parra. The Court concludes that the Defendant has not made a showing of bad faith in this case. There was no evidence at the hearing which showed that Echeverria was

1  deported through other than the normal deportation procedures or that the Government
2  deported Echeverria to gain an unfair tactical advantage over him at trial. The Court further
3  finds that the Defendant cannot make a showing of prejudice. As explained earlier in this
4  order, Echeverria made no statements to assist the jury in finding whether the Defendant acted
5  with the *mens rea* required under 18 U.S.C. § 111. The motion to dismiss Counts 8 and 9 for
6  deportation of exculpatory witness (#74-8) is denied.

## CONCLUSION

IT IS HEREBY ORDERED that 1) motion (#74-1) to dismiss Counts 8 and 9 as duplicitous is denied; 2) the motion (#74-2) to dismiss Counts 8 and 9 for failing to allege elements properly is denied; 3) motion (#74-3) to dismiss Counts 8 and 9 for violation of the Sixth Amendment is denied; 4) motion (#74-4) for bill of particulars is denied; 5) motion (#74-5) to compel Government to elect between multiplicitous counts is denied; 6) motion (#74-6) to suppress evidence for violations of the Fourth Amendment is denied; 7) motion (#74-7, #75-3) for evidentiary hearing on Fourth Amendment violations was granted; 8) motion (#74-8) to dismiss Counts 8 and 9 for deportation of exculpatory witness is denied; 9) motion (#74-9, #75-1) to dismiss for *Brady* violations is denied without prejudice to refile after presentation of evidence at trial; 10) motion (#74-10, #75-2) to dismiss for outrageous conduct is denied; 11) renewed motion (#95-1, #95-2) to compel discovery is moot; and 12) motions (#59, #74-12, and # 111-4) for leave to file further motions are denied.

DATED: October 6, 2010

*William Q. Hayes*
**WILLIAM Q. HAYES**
United States District Judge